Filed 9/23/20  P. v. Belyew CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C086800 |
| Plaintiff and Respondent, | (Super. Ct. No. 16CF06270) |
| v. | OPINION ON TRANSFER |
| LISA MARIE BELYEW, | |
| Defendant and Appellant. | |

This case arises out of a domestic dispute.  On December 23, 2016, defendant Lisa Marie Belyew stabbed her husband in the chest with an ice pick and sprayed him with a fire extinguisher during an argument.  Following a jury trial in which she represented herself, defendant was found guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and infliction of corporal injury upon a spouse (§ 273.5, subd. (a)).  The jury also found true the allegations that she had used a deadly weapon (§ 12022, subd.

---

[1]     Undesignated statutory references are to the Penal Code.

1

(b)(1)), inflicted great bodily injury (§ 12022.7, subd. (a)), and was out on bail for a felony offense at the time the current offenses were committed (§ 12022.1). The trial court sentenced her to an aggregate term of seven years in state prison and she timely appealed.

In March 2020, we affirmed the judgment in an unpublished opinion. (*People v. Belyew* (Mar. 24, 2020, C086800) [nonpub. opn.].) In doing so, we rejected defendant's claims of error and denied her request to remand the matter to the trial court for an ability to pay hearing pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We also rejected defendant's contention that the judgment must be conditionally reversed and the matter remanded for the trial court to determine whether she is eligible for pretrial mental health diversion as authorized under recently enacted section 1001.36.

Our Supreme Court granted review and transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*). In *Frahs*, the court found section 1001.36 applies retroactively to defendants whose cases were not yet final when the Legislature enacted section 1001.36. (*Frahs*, at pp. 640-641.) The court further concluded a defendant need only argue she suffers from a qualifying mental disorder to be entitled to a limited remand to allow the trial court to conduct a mental health diversion eligibility hearing. (*Id*. at p. 640.) As we are bound by our Supreme Court's decision in *Frahs*, we will grant a limited remand for the purpose of determining defendant's eligibility for mental health diversion under section 1001.36. Our conclusions regarding the other issues raised on appeal remain unchanged.

## FACTUAL BACKGROUND

In view of the issues raised on appeal, we summarize only the pertinent facts underlying defendant's crimes. Additional background information relevant to the issues on appeal is discussed below.

In March 2009, defendant married the victim. In December 2016, defendant and the victim lived in Oroville at a halfway house for parolees. They rented one of the three rooms in the downstairs area. No other resident rented a room in that area. The victim and defendant routinely carried weapons to defend themselves from the other residents, including an ice pick, which defendant carried in her pocket. They had both obtained restraining orders against several of the residents.

On December 23, 2016, defendant and the victim got into an argument at their residence about "husband and wife stuff." During that argument, she stabbed him in the chest with an ice pick, sprayed him with a fire extinguisher, and threatened to kill him.[2] The victim eventually fled on foot to a neighbor's house. He told his neighbor that he had been stabbed and asked her to call an ambulance because he "couldn't breathe" and was panicking. When police officers arrived shortly thereafter, the victim was gasping for air and his movements were "uncontrollable." Body camera footage of the interaction was played for the jury. The footage showed that the victim identified defendant as the person who had stabbed him.

---

[2] At trial, the victim testified that he had been hit by a car when he was five years old and suffered severe brain damage as a result. He also said that he suffered from attention deficit disorder and experienced psychotic episodes when he failed to take his prescribed psychotropic medications. Although he asserted that he could not remember the details of the stabbing, he admitted that he and defendant had gotten into an argument prior to the stabbing, and that he had told one of the responding officers that she had stabbed him with an ice pick and called him a "[m]other fucker" and "[p]unk mother fucker." However, he claimed that he had falsely accused defendant of things in the past, including harmful acts, and that she did not stab him with an ice pick. He explained that he was unsure of the perpetrator's identity because he had been sprayed in the face with a fire extinguisher. He was also unsure whether anyone other than defendant had been inside the house at the time of the attack. He claimed that he identified defendant as the perpetrator because he believed he would not receive medical care unless he did so.

Following a brief struggle with the responding officers, the victim was handcuffed and taken to the hospital.[3]  Upon his arrival, he complained of shortness of breath and pain in his chest.  He told the emergency room physician that he had been stabbed with an ice pick.  The physician evaluated him and determined that the small puncture wound in the middle of his chest was consistent with a stab wound from an ice pick.  An X-ray revealed that he had suffered a punctured lung.

The victim was interviewed at the hospital by a police officer later that same day and the following day.  Body camera footage of the interviews was played for the jury.  Consistent with the statements he made at the scene, the victim said that defendant had stabbed him with an ice pick during an argument.

Over the course of the police interviews at the hospital, the victim described in detail what occurred during the incident with defendant on December 23, 2016.  He explained that "[s]ome shit" had previously happened at a motel in Colusa; specifically, defendant had committed a crime she was "fucking pissed about"—she had stabbed the victim with a knife and was arrested and taken to jail.  According to the victim, defendant had started "fuckin' tripping on that Colusa shit" and then, just like in the Colusa incident, tried to stab him through a door with a sharp object.  When he attempted to open the door, she sprayed him with a fire extinguisher.  Eventually, the victim was able to flee out the back door of his residence.  As he did so, defendant chased after him with an ice

---

[3]     When the victim was accused of being under the influence of methamphetamine, he panicked and jumped out of the ambulance.  Thereafter, a brief struggle ensued because he failed to comply with the responding officers' commands.  He was taken to the ground and handcuffed.  During the struggle, he suffered an abrasion on his head.  At trial, he claimed that he had been kicked and punched while he was being detained.  He also claimed that he had been "hogtied."  Because the responding officers' body cameras were not working at the time of the struggle, there was no video footage of this interaction.

pick, calling him a " 'punk motherfucker,' " " 'fuckin' rat,' " and " 'snitch.' "  When she caught up to him, she stabbed him with the ice pick and threatened to kill him.

After the victim was transported to the hospital, officers searched his residence. Body camera footage of the search was played for the jury.  Officers returned to the residence the following day and took photographs.  The photographs showed, among other things, an interior door that appeared to have puncture marks on it, several broken windows, a fire extinguisher upstairs, and powder from a fire extinguisher all over the downstairs floor.  The officers did not find an ice pick.

## DISCUSSION

### 1.0    Defendant's Mental Competence to Represent Herself

Defendant contends the trial court prejudicially erred in allowing her to represent herself while she was mentally incompetent in violation of her constitutional rights.  We disagree.

#### 1.1    *Additional Background*

A felony complaint was filed against defendant on December 28, 2016.  Among other things, it alleged that defendant had assaulted the victim with a deadly weapon (ice pick) (§ 245, subd. (a)(1)).  One week later at the arraignment hearing, defense counsel declared a doubt as to defendant's competence.  In response, the trial court suspended criminal proceedings and appointed Dr. Mark Streets to evaluate defendant's mental competence.

On January 25, 2017, the trial court reinstated criminal proceedings and granted defendant's request for self-representation.  Less than two weeks later, the prosecutor filed a letter brief expressing concern over the procedure the court had used to determine defendant's competency before granting her request for self-representation.  The prosecutor asked the court to reappoint counsel, suspend criminal proceedings, and appoint two doctors to evaluate defendant's mental competence.  The court granted the prosecutor's request.

5

In a report filed on March 6, 2017, Dr. Streets opined that defendant was incompetent to stand trial. Two weeks later, Psychwest, Clinical & Forensic Psychology, Inc., filed a report, which was inconclusive as to defendant's competency to stand trial.

On June 21, 2017, the trial court issued an order finding that it was appropriate to place defendant with the Department of State Hospitals. On October 16, 2017, the Napa State Hospital submitted a progress report recommending that defendant be retained for further evaluation, as it was not yet clear whether she was competent to stand trial.

On November 27, 2017, the Napa State Hospital submitted a progress report concluding that defendant was competent to stand trial. The report stated that, in a competency evaluation on November 13, 2017, defendant displayed "euthymic affect" (i.e., normal or stable mental state or mood) and reported that she was doing well. She was polite and cooperative and appeared eager to be found competent to stand trial. The evaluator noted that defendant displayed no "obvious" signs of mental illness at any time during the evaluation, and that available medical records did not show clear signs of mental illness.[4] The evaluator opined that defendant was able to understand the nature of the criminal proceedings and was able to assist counsel, explaining, in part, as follows: "[Defendant] adequately understands the proceedings against her. She correctly identified her charges and provided adequate descriptions of what she has been accused of doing. She acknowledged the amount of time she [was] facing if found guilty as well as the possibility that she could be incarcerated in prison. She added that she could receive a strike on her record and was aware that a strike would increase the sentence if she [was] convicted." The evaluator further explained that while defendant's "negative attitude toward law enforcement and other certain authority figures" would make her "challenging for any attorney," she had the capacity to cooperate in a rational manner and

---

[4] During the evaluation, defendant stated that she did not have a mental illness and denied a history of being diagnosed with and/or treated for mental illness.

6

"demonstrated that she [was] able to discuss her case calmly and rationally and also that she ha[d] the capacity to consider advice and weigh the potential pros and cons of her options when making decisions. Furthermore, there [were] no signs or symptoms of mental illness which would interfere with her ability to communicate effectively with her attorney and assist in the planning o[f] her defense."

On December 20, 2017, the trial court found defendant competent to stand trial and reinstated criminal proceedings. The court also granted defendant's request for self-representation (hereafter, *Faretta* motion).[5] In her *Faretta* waiver, defendant, among other things, indicated that she had completed high school and "legal education," and had been granted the right to represent herself in three other criminal matters.

Defendant represented herself throughout the course of the proceedings below, including trial, without the assistance of counsel.

### 1.2    *General Legal Principles*

A defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution. (*Faretta, supra*, 422 U.S. at p. 807; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069.) A defendant may waive this right and personally represent himself or herself, so long as the defendant's waiver of the right to counsel is valid. A valid waiver requires that the defendant possess the mental capacity to comprehend the nature and object of the proceedings against him or her, and that the defendant waive the right knowingly and voluntarily. (*Koontz,* at pp. 1069-1070.) If a defendant has validly waived the right to counsel, a trial court must grant a defendant's request for self-representation. (*People v. Welch* (1999) 20 Cal.4th 701, 729.)

In *Godinez v. Moran* (1993) 509 U.S. 389 [125 L.Ed.2d 321] (*Godinez*), the United States Supreme Court rejected the notion that the standard for determining

---

[5]    *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta*).

competence to plead guilty or waive counsel was higher than or different from the standard for competence to stand trial. (*Id*. at pp. 397-400.) The high court reasoned that "the competence that is required of a defendant seeking to waive his [or her] right to counsel is the competence to *waive the right*, not the competence to represent himself [or herself]" (*id.* at p. 399, fn. omitted), and "a criminal defendant's ability to represent himself [or herself] has no bearing upon [their] competence to *choose* self-representation" (*id*. at p. 400, fn. omitted).

Following *Godinez*, the California Supreme Court held that the standard for competency for self-representation was the same as the standard for competency to stand trial. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1373; see *People v. Halvorsen* (2007) 42 Cal.4th 379, 433.)

In *Indiana v. Edwards* (2008) 554 U.S. 164 [174 L.Ed.2d 345] (*Edwards*), the United States Supreme Court held that the federal Constitution does not prohibit state courts from denying self-representation to defendants who are mentally competent to stand trial with an attorney, i.e., are trial competent, but who, because of severe mental illness, are not competent to conduct their own defense at trial. (See *id*. at pp. 173-178 [referring to such defendants as "gray-area" defendants].)

After *Edwards*, the California Supreme Court held that California trial courts "*may* deny self-representation in those cases where *Edwards* permits such denial." (*People v. Johnson* (2012) 53 Cal.4th 519, 528 (*Johnson*), italics added.) In other words, trial courts have the discretion to prohibit "gray-area" defendants from representing themselves. (*Id*. at p. 530.) In so holding, the *Johnson* court explained that *Edwards* does not *mandate* a higher standard of mental competence for self-representation than for trial with counsel. (*Johnson*, at p. 527.) Under *Edwards*, "[T]he standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from *a severe mental illness* to the point where he or she *cannot carry out the basic tasks needed to present the defense* without the help of counsel." (*Johnson*,

8

at p. 530, italics added.) The court cautioned, however, that, "Trial courts must apply this standard cautiously. . . . Criminal defendants still generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Id.* at p. 531.)

The critical question in determining competence for purposes of self-representation is not whether a self-represented defendant meets the standards of an attorney, or even whether a defendant is capable of conducting an effective defense, but only whether he or she can carry out the basic tasks needed to present the defense without the help of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 206 (*Mickel*); *People v. Taylor* (2009) 47 Cal.4th 850, 866 (*Taylor*).) "[T]he likelihood or actuality of a poor performance by a defendant acting in propria persona [does not] defeat the federal self-representation right." (*Taylor*, at p. 866.) "[W]e have accepted that the cost of recognizing a criminal defendant's right to self-representation may result ' "in detriment to the defendant, if not outright unfairness." ' " (*Mickel*, at p. 206 ["We have . . . rejected claims that the fact or likelihood that an unskilled, self-represented defendant will perform poorly in conducting his or her own defense must defeat the *Faretta* right."].)

Our review of the trial court's determination of competency is deferential because the trial court had the opportunity to observe the defendant throughout the course of the proceedings. The decision is fact-specific to the defendant. (*In re R.V.* (2015) 61 Cal.4th 181, 198.) We review for abuse of discretion, and we will uphold the trial court's decision if supported by substantial evidence. (*Johnson, supra*, 53 Cal.4th at p. 531.)

9

### 1.3    *Analysis*

We conclude defendant has failed to demonstrate that the trial court abused its discretion in allowing her to represent herself throughout the course of the proceedings below.

We reject defendant's initial contention that the trial court erred by failing to inquire into her mental health competence based on the erroneous assumption that the standards for competency to stand trial and competency for self-representation are identical.  According to defendant, the trial court, in determining her competence for self-representation, should have applied a stricter standard that mere competence to stand trial.  We disagree.  As defendant appears to recognize, her claim of error is foreclosed by *Taylor.*

In *Taylor*, the trial court granted the defendant's request to represent himself. (*Taylor, supra*, 47 Cal.4th at p. 868.)  Relying on *Edwards*, the defendant contended on appeal that he was incompetent to represent himself and that the trial court had acted under the mistaken belief his request for self-representation could not be denied once he was found "trial competent."  (*Taylor,* at p. 866.)  Our Supreme Court observed, "The court in *Edwards* did not hold, contra to *Godinez*, that due process mandates a higher standard of mental competence for self-representation than for trial with counsel.  The *Edwards* court held only that states *may*, without running afoul of *Faretta*, impose a higher standard, a result at which *Godinez* had hinted by its reference to possibly 'more elaborate' state standards.  [Citation.]  'In light of *Edwards*, it is clear . . . that we are free to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial.  It is equally clear, however, that *Edwards* does not *mandate* the application of such a dual standard of competency for mentally ill defendants.  In other words, *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to

10

represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.' [Citation.] *Edwards* thus does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*Id.* at pp. 877-878.)

In *Johnson*, our Supreme Court reiterated its holding in *Taylor* that *Edwards* does not mandate a higher standard of mental competence for self-representation. (*Johnson, supra*, 53 Cal.4th at p. 527.) The court wrote, "Because the *Edwards* rule is permissive, not mandatory, we held [in *Taylor*] that *Edwards* 'does not support a claim of federal constitutional error in a case like the present one, in which [the] defendant's request to represent himself was granted.' " (*Ibid.*) Our case is indistinguishable from *Taylor* on this point. There is no constitutional error in allowing a defendant who is competent to stand trial to represent herself. And defendant here makes no claim that she was not competent to stand trial.

Contrary to defendant's contention, the trial court did not err by failing to conduct an additional hearing to determine her competency for self-representation prior to granting her *Faretta* motion. "A trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson, supra*, 53 Cal.4th at p. 530.) Here, the record reflects that, at the time defendant's *Faretta* motion was granted on December 20, 2017, the trial court had no reason to conclude that she was suffering from a severe mental illness to the point where she could not carry out the basic tasks needed to present her defense without the assistance of counsel. Indeed, the report submitted by the Napa State Hospital on November 27, 2017, which found defendant competent to stand trial, determined that defendant was not presently displaying any obvious signs of mental illness, and that available medical records did not show clear signs of mental illness. The report also

11

noted that defendant claimed she did not suffer from mental illness and denied a history of being diagnosed with and/or treated for mental illness. On this record, we cannot conclude that the trial court abused its discretion in granting defendant's *Faretta* motion.

We find no merit in defendant's alternative contention that, even assuming the trial court properly granted her *Faretta* motion, the court erred by failing to monitor and recognize her subsequent " 'indicia of mental incapacity' " for self-representation (e.g., filing of nonsensical motions and " 'bizarre' " documents) and order a new competency hearing on the question of her competency for self-representation.

" 'Even when a defendant is competent at the commencement of his [or her] trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.) "[A] trial court is obligated to conduct a full competency hearing if substantial evidence raises a reasonable doubt that a criminal defendant may be incompetent. This is true even if the evidence creating that doubt is presented by the defense or if the sum of the evidence is in conflict. The failure to conduct a hearing despite the presence of such substantial evidence is reversible error." (*Id*. at p. 691.)

" ' "When a competency hearing has already been held and defendant has been found competent to stand trial, . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" ' " (*Taylor, supra*, 47 Cal.4th at p. 864.) On appeal, "[i]n resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217.) We give deference to the trial court's decision whether or not to hold a competency hearing, because the trial court had

12

the opportunity to observe the defendant during trial. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

"Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations." (*People v. Rogers, supra,* 39 Cal.4th at p. 847; see *Johnson, supra*, 53 Cal.4th at pp. 525, 532-533 & fn. 2 [evidence of incompetence includes bizarre, noncompliant, or disruptive behavior and the filing of nonsensical motions or bizarre documents].) "To raise a doubt under the substantial evidence test, [courts] require more than 'mere bizarre actions' or statements, or even expert testimony that a defendant is psychopathic, homicidal, or a danger to him- or herself and others. [Citations.] Rather, the focus of the competence inquiry is on a defendant's understanding of the criminal proceedings against him or her and the ability to consult with counsel or otherwise assist in his or her defense." (*Mickel, supra*, 2 Cal.5th at p. 202.) "[E]ven a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt concerning a defendant's competence and to conduct a hearing on that issue." (*People v. Blair* (2005) 36 Cal.4th 686, 714, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

Applying these principles to the record before us, we conclude the trial court was not presented with substantial evidence raising a reasonable doubt as to defendant's mental competence after she was found competent to stand trial and her *Faretta* motion was granted on December 20, 2017. Having reviewed the portions of the record relied upon by defendant, and giving appropriate deference to the trial court, we find no error in the trial court's decision not to hold another competency hearing in light of defendant's conduct in representing herself. There is evidence in the record indicating that defendant had been diagnosed with mental health issues predating the trial in this case, which the trial court was aware of, including unspecified bipolar disorder, unspecified schizophrenia spectrum, antisocial personality disorder, other psychotic disorder, and

13

substance use disorders. The record also discloses that defendant filed documents that a reasonably competent attorney would not have filed and made bizarre and/or paranoid statements in some of her court filings, which were at times rambling and incoherent. However, the evidence defendant points to does not, in our view, amount to a substantial change of circumstances or new evidence raising a reasonable doubt as to the trial court's competency finding. Defendant has not directed us to anything in the record showing that she was not competent to stand trial because she lost her ability to understand the nature of the criminal proceedings. Nor has she shown that the trial court was presented with substantial evidence that she was not competent to conduct trial proceedings by herself because she lacked the ability to carry out the basic tasks needed to present her defense without the help of counsel due to severe mental illness. Accordingly, we reject defendant's claim that the trial court erred by failing to suspend proceedings and order another competency hearing.

## 2.0 *Pitchess*[6] **Motion**

Defendant contends the trial court prejudicially erred in denying her *Pitchess* motion, which sought to compel discovery of information from the personnel records of the police officers who responded to the scene on the date of the stabbing. She argues the court abused its discretion in finding that she failed to establish good cause for in camera review of the records. According to defendant, good cause existed because the records were relevant to her defense that the officers used excessive force to coerce the victim into implicating her as the perpetrator of the stabbing. We disagree.

A criminal defendant is entitled to discovery of certain information in the personnel records of a police officer accused of misconduct upon a showing of good cause. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016 (*Warrick*); *Pitchess,*

---

[6]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

14

*supra*, 11 Cal.3d at pp. 536-538.) By requiring a showing of good cause, the *Pitchess* procedure balances a defendant's right to discovery of all information pertinent to her defense and a peace officer's right to privacy. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 81-84 (*City of Santa Cruz*).)

"Good cause for discovery exists when the defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.] A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.' " (*Warrick, supra*, 35 Cal.4th at p. 1016.) This two-part showing is a "relatively low threshold for discovery." (*City of Santa Cruz, supra*, 49 Cal.3d at p. 83.) Once the trial court determines good cause has been shown, it must conduct an in camera review of the records and disclose only those records and information that are relevant and not subject to exclusion from disclosure. (Evid. Code, § 1045, subds. (a) & (b).)

"To show good cause[,]. . . defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses. These requirements ensure that only information 'potentially relevant' to the defense need be brought by the custodian of the officer's records to the court for its examination in chambers." (*Warrick, supra*, 35 Cal.4th at p. 1024; see *People v. Salcido* (2008) 44 Cal.4th 93, 146 [a "logical connection" must be established between the charges and the proposed defense to establish good cause for the granting of a *Pitchess* motion].) The trial court determines "whether defendant's averments, '[v]iewed in conjunction with the police reports' and any other documents, suffice to 'establish a plausible factual foundation' for the alleged officer misconduct and to 'articulate a valid theory as to how the information sought might be admissible' at trial." (*Warrick*, at p.

15

1025.)  The allegations in the defense declaration must be factually specific and tailored to support the claim of officer misconduct.  (*Id*. at p. 1027.)

The defense declaration need only describe a "plausible factual foundation" for the claim of "specific police misconduct that is both internally consistent and supports the defense proposed to the charges."  (*Warrick, supra*, 35 Cal.4th at pp. 1025-1026.)  However, "*Warrick* did not redefine the word 'plausible' as synonymous with 'possible,' and does not require an in camera review based on a showing that is merely imaginable or conceivable and, therefore, not patently impossible.  *Warrick* permits courts to apply common sense in determining what is plausible, and to make determinations based on a reasonable and realistic assessment of the facts and allegations."  (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1318-1319.)

We review the trial court's denial of discovery of information from police officer personnel records for an abuse of discretion.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.)  Under that standard, judicial discretion is abused only if the court exceeds the bounds of reason under all of the circumstances by making an arbitrary or capricious determination.  (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Here, the defense theory was that an unidentified third-party attacked the victim. Prior to trial, defendant filed a *Pitchess* motion, which sought discovery of information in the responding officers' personnel records for matters pertaining to "unnecessary force or violence, acts demonstrating racial or ethnic prejudice, illegal or false arrest, improper tactics, dishonesty, false imprisonment, false police reports, and illegal search and seizure."  According to defendant, the responding officers used excessive force on the vitim, including repeatedly kicking him in the head, to coerce him into implicating her as the perpetrator of the attack.  Defendant therefore asserted that records of dishonesty, using improper tactics, and fabrication would be relevant to prove her innocence, as the "arrest report" was "fabricated" and "[t]he credibility of the arresting officer [was] the entirety of the case against [her]."  The trial court denied defendant's motion, finding that

16

she had failed to show good cause to justify in camera review of the responding officers' personnel records.

We conclude that the trial court did not err in denying defendant's *Pitchess* motion. While defendant was not required to present a factual scenario that was reasonably likely to have occurred or was credible or even believable, (*Warrick, supra*, 35 Cal.4th at pp. 1025-1026), she was required to give some plausible alternative factual account that, if true, showed that the police report identifying her as the perpetrator of the attack on the victim was inaccurate. The critical problem with defendant's motion is its failure to provide a plausible explanation of events in which the victim could have sustained the puncture wound to his chest by someone other than her. She did not articulate a specific and tailored factual scenario explaining how the version of events set forth in the police report was inaccurate. In short, she failed to offer a plausible factual foundation for the alleged officer misconduct. We note that, although defendant claimed that the victim's statement at the scene identifying her as the perpetrator of the stabbing was coerced through excessive force, the police reports attached to her *Pitchess* motion show that the victim also identified her as the perpetrator during his police interviews at the hospital, which occurred on the date of the stabbing and the following day. Defendant made no claim that the statements the victim made at the hospital were coerced. Further, the victim did not submit a declaration in support of the *Pitchess* motion averring that any officer used excessive force to coerce him into identifying defendant as the perpetrator, either at the scene or later at the hospital. Finally, while defendant averred that the police report showed that the officers used "excessive and illegal use of force" in detaining the victim, the police reports attached to defendant's motion clearly state that the victim identified defendant as the perpetrator prior to being taken to the ground and detained in handcuffs. On this record, we cannot conclude that the trial court abused its discretion in denying defendant's *Pitchess* motion.

17

**3.0     Alleged Evidentiary Errors**

Defendant contends reversal is required because the trial court erroneously admitted evidence of a prior uncharged act of domestic violence—specifically, evidence of an altercation she had with the victim in Colusa on February 2, 2016.  According to defendant, this evidence should have been excluded because it was not timely disclosed by the prosecution.  Defendant alternatively contends reversal is required because the trial court erred in excluding evidence that discredited a prosecution witness in violation of the Evidence Code and her constitutional rights, including her right to confront and cross-examine witnesses against her.  She argues that the trial court should have permitted her to cross-examine Colusa police officer Larry Lorman about his preliminary hearing testimony in which he purportedly admitted to grabbing her buttocks during her arrest in connection with the Colusa incident.  Finally, defendant contends the trial court erred in excluding evidence of the federal civil rights case she filed, which alleged that officers (including Officer Lorman) assaulted her during the Colusa incident.  According to defendant, this evidence was relevant and admissible to impeach the credibility of Officer Lorman by showing that he had "biased financial and professional interests in testifying favorably for the prosecution and unfavorably for [her]," as "[i]t was in [his] interests to cast [her] in the worst light possible while denying his own wrongdoing and any wrongdoing by any other Colusa officers."  We find no evidentiary error.

3.1     *Additional Background*

On February 2, 2016, defendant and the victim were staying at a motel in Colusa.  Around 6:00 p.m., Officer Lorman was dispatched to room 109 of the motel after defendant called 911 and claimed that the victim had attacked her.  During the 911 call, defendant said that the victim was knocking on the window and she was "about ready to stab a mother fucker for real."  Upon his arrival at the motel, Officer Lorman spoke with defendant, who had a hunting knife in her waistband.  Because defendant was

18

uncooperative, "verbally hostile," and refused to report what had happened, Officer Lorman left the area.

Officer Lorman returned to the motel about an hour later following a report that a male had been stabbed. Upon his arrival at the motel the second time, Officer Lorman spoke with the victim, who had a wound on his right forearm and was incoherent. The victim said that "somebody" had stabbed him in room 109 and that he crawled through the bathroom window. When Officer Lorman entered the room, defendant pretended to be asleep, even though Officer Lorman had knocked on the door and announced his presence. Defendant had no visible injuries but her face and clothes were covered in blood. During the ensuing interaction, defendant became combative with Officer Lorman, including spitting and kicking at him. She was eventually handcuffed and taken to jail.

A search of the motel room revealed that it was in disarray and there was blood spatter in the bedroom area and the bathroom. There were no other people in the room and no signs of entry into the room other than the bathroom window. The knife that had been in defendant's waistband earlier that day was broken into two pieces—part of the knife was in the bathroom and part of the knife was in the bedroom area. The bathroom door had a large hole all the way through it. There was no blood on the knife.

Prior to trial, the prosecution filed a motion seeking to introduce evidence of this prior incident of domestic violence under Evidence Code section 1109 to show defendant's propensity to commit the current offenses involving domestic violence. The prosecution also sought an order excluding any reference to the federal civil rights case filed by defendant, which alleged that officers had assaulted her during the Colusa incident. The prosecutor argued that such evidence was "peripheral to the acts in question" in this case and more prejudicial than probative, would consume an undue amount of time, and had no logical bearing on whether defendant had assaulted the victim in the Colusa incident or in this case.

19

At the hearing on the motions, the trial court granted the prosecution's motion to exclude evidence of the federal civil rights case filed by defendant, finding that the evidence was irrelevant, and to the extent that it was relevant, it was excludable under Evidence Code section 352 because the presentation of that evidence would necessitate an undue consumption of time. The court ruled that evidence related to the prior incident of domestic violence was admissible (i.e., the Colusa incident), subject to an Evidence Code section 402 hearing to determine whether any of the evidence should be excluded on the ground that its probative value was substantially outweighed by its prejudicial effect.

Three days later, on the second day of trial, defendant claimed that the prosecution had violated its discovery obligations by failing to timely disclose evidence related to the Colusa incident, including videos from the responding officers' body cameras. Defendant indicated that she wanted all the evidence related to the incident excluded. In response, the prosecutor explained that he had obtained the police reports regarding the incident about a week earlier and had immediately disclosed them to defendant. The prosecutor noted that defendant was representing herself in the criminal action that had been brought against her in Colusa County based on the incident at the motel. The prosecutor also noted that he had been informed by the investigators involved in the Colusa case that defendant had been provided discovery in a timely manner. The prosecutor, however, suggested that defendant request a continuance as a remedy for the untimely disclosure of evidence.

When asked, the prosecutor told the trial court that he intended on calling two officers to testify about the Colusa incident, playing a video recording of the motel room where the incident occurred, and introducing photographs of the motel room. The prosecutor also stated that he intended on calling a third officer to testify about a statement the victim made during the investigation of the Colusa incident. In response, defendant requested permission to introduce video footage from the responding officers'

20

body cameras to impeach their testimony, claiming that "false reports [had been] made and perjury committed." The trial court did not rule on defendant's request. Defendant did not ask for a continuance to meet the untimely disclosed evidence, and the trial court did not impose any sanction as a remedy for the untimely disclosure.

At trial, the following exchange occurred regarding the Colusa incident during defendant's cross-examination of Officer Lorman:

"[Defendant]: Do you recall what happened during the detention in the room?

"[Officer Lorman]: Yes.

"[Defendant]: Could you inform the jury?

"[Officer Lorman]: You were detained. You were combative. You were placed in cuffs. We took you out of the room, still argumentative, combative, and placed you in my car and you started kicking the door.

"[Defendant]: During the arrest when you were detaining me, was I yelling at you to stop grabbing my buttocks in an aggressive manner?

"[Officer Lorman]: Yes. You were yelling that.

"[Defendant]: Did you stop grabbing my buttocks in an aggressive manner?

"[Officer Lorman]: I didn't touch your buttocks.

"[Defendant]: I have the prelim transcript here where he did testify to that. And I would like to show it to the witness."

After the prosecutor objected, the trial court reviewed the preliminary hearing transcript and denied defendant's request to continue this line of questioning,[7] explaining that the preliminary hearing testimony referenced by defendant was not impeachment

---

[7]     Defendant argued that she should be allowed to impeach Officer Lorman regarding his testimony that he did not grab her buttocks during her arrest in connection with the Colusa incident because it "explain[ed] her reaction," i.e., why she was combative when she was detained.

21

because Officer Lorman's testimony was consistent with his trial testimony. Defendant did not request to introduce video footage from the responding officers' body cameras to impeach Officer Lorman on this point.

### 3.2 *Discovery Violation*

Evidence Code section 1109, subdivision (a) permits the admission of evidence of a defendant's commission of prior acts of domestic violence in a criminal action in which the defendant is accused of an offense involving domestic violence. The prosecution is required to disclose evidence of prior acts of domestic violence in compliance with section 1054.7. (Evid. Code, § 1109, subd. (b).)

Section 1054.7 requires that disclosures be made "at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred." Generally, when a party fails to comply with the criminal discovery statutes, the court may make any order necessary "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) In addition, "the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Ibid*.) Courts have recognized, however, that "the exclusion of testimony is not an appropriate remedy absent a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial." (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358; see *People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1758.)

We review a trial court's ruling on discovery matters for an abuse of discretion. (*People v. Lamb* (2006) 136 Cal.App.4th 575, 581; see *People v. Ayala* (2000) 23 Cal.4th 225, 299 [" '[A] trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to [a]. . . violation of a discovery order.' "].)

Here, the record discloses that the trial court implicitly overruled defendant's untimely disclosure objection, finding that the prosecution's late disclosure of evidence

22

did not warrant a sanction, including the sanction requested by defendant—exclusion of evidence. We find no abuse of discretion. At trial, defendant did not show that exclusion of evidence was warranted. She did not establish that the prosecution was trying to gain a tactical advantage by the untimely disclosure or that the untimely disclosure would cause her significant prejudice. Indeed, she did not specifically deny the prosecutor's claim that she had previously been provided the untimely disclosed evidence in connection with the criminal charges pending against her in the Colusa case. On appeal, defendant has failed to demonstrate prejudice. It is the defendant's burden to establish that the prosecution's failure to comply with discovery requirements in a timely manner was prejudicial and that a continuance would not have cured the harm. (*People v. McKinnon* (2011) 52 Cal.4th 610, 668-669.) Defendant makes no attempt to show how her defense would have been different had the prosecution timely disclosed the evidence of her prior act of domestic violence. Instead, she argues that the late disclosure precluded a complete and thorough review of the police reports and denied her the opportunity to investigate the Colusa incident and prepare for the presentation of evidence regarding the incident. The record, however, reflects that defendant had six days to review the reports prior to her untimely disclosure objection and chose not to request a continuance, as suggested by the prosecutor. We find defendant's showing insufficient to establish that she was prejudiced by the untimely disclosure of evidence.

### 3.3  *Restriction on Cross-examination*

The Sixth Amendment affords all defendants the right to confront and cross-examine witnesses against them. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 683] [the right of cross-examination is "secured for defendants in state as well as federal criminal proceedings"].) The defense is typically given wide latitude to test the credibility of such witnesses, but the trial court may still place reasonable limits on defense counsel's inquiries. (*People v. Pearson* (2013) 56 Cal.4th 393, 455 (*Pearson*).) Trial courts have broad discretion to impose reasonable limits on cross

examination, "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall,* at p. 679; see *Pearson,* at p. 454 ["trial courts have broad discretion ' "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . ." ' "].) " '[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*United States v. Owen* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 957].)

" '[A] criminal defendant states a violation of the Confrontation Clause by showing that he [or she] was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citations.] ' "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." [Citation.]' " (*Pearson, supra*, 56 Cal.4th at pp. 455-456.)

Nor does reliance on Evidence Code section 352 to limit cross-examination by excluding evidence of marginal impeachment value that would entail the undue consumption of time contravene a defendant's constitutional rights to confrontation and cross-examination. (*Pearson, supra*, 56 Cal.4th at p. 455; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights' "]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 207 ["A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352."].)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 745.) The exclusion of impeachment evidence will only be disturbed " 'on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' " (*Ibid*.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

We find no abuse of discretion. As an initial matter, we note that evidence related to defendant's federal civil rights case, which was based on the responding officers' conduct at the motel in Colusa on February 2, 2016, was not relevant to whether defendant was guilty of attacking the victim at their home in Oroville on December 23, 2016. The conduct of police officers in an unrelated case had no relevance to whether defendant committed the crimes charged in this case. Moreover, the alleged misconduct of the officers in the Colusa case—assaulting defendant during her arrest—was not relevant to whether she committed an act of domestic violence against the victim at the motel prior to her arrest. Thus, the federal civil rights case had little, if any, significance to the issues contested at trial.

To the extent that defendant sought to impeach the credibility of Officer Lorman by cross-examining him regarding the unproven allegations in her federal civil rights case, the trial court did not abuse its discretion in prohibiting such questioning. This line of inquiry had marginal probative value at best and the trial court was properly concerned that the inquiry risked undue consumption of time on a collateral credibility matter. There was no proof supporting defendant's claim that Officer Lorman had not testified truthfully regarding the Colusa incident—specifically, his assertion that he did not grab defendant's buttocks when she was detained. The trial court reviewed Officer Lorman's

testimony from the preliminary hearing and determined it was consistent with his trial testimony. Defendant did not proffer any evidence showing that Officer Lorman gave testimony in the Colusa case that was inconsistent with his testimony in this matter. Nor did defendant proffer any video evidence contradicting Officer Lorman's testimony. Under these circumstances, we conclude the trial court acted well within its discretion in excluding the proposed cross-examination, and, accordingly, there was no violation of defendant's constitutional rights. Even if bias on the part of Officer Lorman could have been inferred by the mere existence of the federal civil rights case as defendant claims, any probative value in admitting the lawsuit evidence was minimal and would have been substantially outweighed by the risk of undue consumption of time and the possibility of distracting the jury from deciding defendant's guilt for the crimes charged in this case. (See *People v. Hart* (1999) 20 Cal.4th 546, 604-607 [affirming exclusion of evidence of pending civil suit where trial court found the suit had minimal probative value, which was substantially outweighed by the probability that the presentation of the evidence would require the undue consumption of time and would create a substantial risk of confusing the issues and misleading the jurors].)

Finally, even if we were to assume error, it was harmless. It is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the claimed evidentiary error. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [where trial court ruling was not a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense, review is under *People v. Watson* (1956) 46 Cal.2d 818, 836].) Here, the record contains strong evidence of defendant's guilt for the charged offenses, including multiple video-recorded instances in which the victim identified her as the person who had attacked him. In the recordings, the victim described in detail how the incident started and what defendant did, which was supported by the evidence at the scene. The defense theory was that some unidentified third-party had attacked the victim. The primary evidence supporting this theory was

26

defendant's own testimony. When defendant testified, she admitted that she told one of the responding officers that she and the victim had gotten into an argument earlier in the day, but denied stabbing the victim and denied seeing who did. She explained that she heard noises inside her house, including footsteps coming down the stairs, and a commotion outside her bedroom door. When she opened her door, she was sprayed with something, which made it difficult for her to breath and see. After she closed the door, she heard sounds like someone trying to break the door down. While defendant claimed that she was "attacked" and sustained injuries, she did not document her injuries, call the police to report the attack, or tell the responding officers that she had been attacked by an unknown person inside her home. Had the jury believed defendant's version of events, they would have acquitted her of the charged crimes, even in the absence of the evidence defendant sought to introduce to impeach Officer Lorman.

## 4.0 Alleged Instructional Error

At the close of the evidence, defendant requested that the jury be instructed regarding an uncharged perpetrator pursuant to a modified version of CALCRIM No. 373 (Other Perpetrator).[8] She argued that the instruction was warranted because there was

---

[8]     Defendant's proposed modified version of CALCRIM No. 373 provided:

"373.  Other Perpetrator

"The evidence shows that another person/other persons may have been involved in the commission of the crimes charges against the defendant.

"There may be many reasons why someone who appears to have been involved might not be available in this particular trial.

"You may [*sic*] speculate about whether that other person or other persons have been or will be prosecuted.

"Your duty is to decide whether the defendant on trial here committed the crimes charged."

27

evidence that someone else had been inside her residence at the time the victim was attacked on December 23, 2016. The trial court denied defendant's request, concluding that the instruction was not applicable because it relates to a case involving an unjoined codefendant and there was no allegation that such a person existed here. The court, however, advised defendant that she could make her third-party culpability argument during closing argument "in relation to whether the People have proved all of their elements beyond a reasonable doubt."

On appeal, defendant contends the trial court prejudicially erred in refusing to instruct the jury with her modified version of CALCRIM No. 373. According to defendant, the trial court's refusal violated her constitutional rights because the instruction was supported by the evidence and constituted her sole theory of defense. We disagree.

CALCRIM No. 373 provides: "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether (that other person has/those other persons have) been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

"A criminal defendant has the right to instructions that pinpoint the theory of the defense case." (*People v. Gurule* (2002) 28 Cal.4th 557, 660.) A pinpoint instruction is one that does not involve a general principle of law but instead " 'relate[s] particular facts

---

On appeal, defendant asserts that her proposed modified instruction should have included the word "not" in the third paragraph such that it read, "You may *not* speculate . . ."

to a legal issue in the case or "pinpoint[s]" the crux of a defendant's case, such as mistaken identification or alibi.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 675.)

Here, CALCRIM No. 373 would not have functioned as a pinpoint instruction because it did not relate particular facts to the defense theory that someone other than defendant was responsible for attacking the victim. As written, CALCRIM No. 373 does not require the jury to consider evidence that someone else committed the crime, nor does it prevent the jury from doing so. "It merely says the jury is not to speculate on whether someone else might or might not be *prosecuted*." (*People v. Farmer* (1989) 47 Cal.3d 888, 918 [analyzing similar instruction—CALJIC No. 2.11.5 (Unjoined Perpetrators of Same Crime)], overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) Accordingly, because there was no evidence concerning a potential prosecution against another perpetrator, the trial court did not err when it refused to instruct the jury with CALCRIM No. 373.

In any event, any error in failing to give the instruction was harmless. The jury was informed under various other instructions that it could not convict defendant unless it was convinced beyond a reasonable doubt that she—rather than some other person—committed the charged crimes. Had the jury believed that someone other than defendant had attacked the victim, it would have acquitted her of the charged crimes, even in the absence of CALCRIM No. 373.

## 5.0    Cumulative Error

Because we have rejected all of defendant's claims of error on the merits, we likewise reject her contention that the cumulative effect of the trial court's errors requires reversal. (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

## 6.0    Pretrial Mental Health Diversion

Defendant contends that the matter must be remanded to the trial court to determine whether she is eligible for pretrial mental health diversion due to qualifying mental disorders (bipolar & schizophrenia) under the recently enacted section 1001.36,

which she argues is retroactive as to all cases not yet final. In support of her contention, defendant relies on the retroactivity rules of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*).

Originally, we concluded that section 1001.36 did not have retroactive effect as to cases, like this one, that had already reached the stage of conviction (whether by jury or by plea) before the statute's effective date. However, pursuant to our Supreme Court's decision in *Frahs*, the People concede and we now conclude that defendant is entitled to a limited remand to the trial court for a determination on her eligibility for mental health diversion under section 1001.36. (See *Frahs, supra*, 9 Cal.5th at pp. 640-641.) Section 1001.36 was enacted after defendant's sentencing (Stats. 2018, ch. 34, § 24, eff. June 27, 2018) and provides pretrial diversion may be granted if the trial court finds all of the following criteria are met: (1) the defendant suffers from a recently diagnosed mental disorder enumerated in the statute; (2) the disorder was a significant factor in the commission of the charged offense, and that offense is not one of the offenses enumerated in subdivision (b); (3) "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment"; (4) the defendant consents to diversion and waives her right to a speedy trial; (5) the defendant agrees to comply with treatment as a condition of diversion; and (6) the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community. (§ 1001.36, subd. (b)(1)-(2).) If the treatment under pretrial diversion is deemed successful, the charges shall be dismissed and the defendant's criminal record expunged. (§ 1001.36, subds. (b)(1)(A)-(C), (c)(3), (e).)

The statute further provides: "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and

30

may proceed on offers of proof, reliable hearsay, and argument of counsel. If a prima facie showing is not made, the court may summarily deny the request for diversion or grant any other relief as may be deemed appropriate." (§ 1001.36, subd. (b)(3).)

In *Frahs*, our Supreme Court concluded *Estrada's* inference of retroactivity applies to section 1001.36 such that defendants with qualifying mental disorders whose cases are not yet final are entitled to limited remand for the trial court to determine whether they are eligible for mental health diversion. (*Frahs, supra*, 9 Cal.5th at pp. 624-625; see *Estrada, supra*, 63 Cal.2d 740.) The court concluded "the possibility of being granted mental health diversion rather than being tried and sentenced 'can result in dramatically different and more lenient treatment.' " (*Frahs*, at p. 631, quoting *Lara, supra*, 4 Cal.5th at p. 303.) Our Supreme Court relied on its decision in *Lara*, where it concluded the ameliorative benefits of Proposition 57, which prohibits prosecutors from charging juveniles with crimes directly in adult criminal court, are retroactively applicable to juveniles whose judgments are not yet final at the time Proposition 57 was enacted. (*Frahs*, at p. 629; *Lara,* at pp. 303-304.) The *Frahs* court concluded the pertinent facts "are like those involved in *Lara*." (*Frahs*, at p. 631.) Specifically, the court reasoned "the impact of a trial court's decision to grant diversion can spell the difference between, on the one hand, a defendant receiving specialized mental health treatment, possibly avoiding criminal prosecution altogether, and even maintaining a clean record, and on the other, a defendant serving a lengthy prison sentence." (*Ibid*.) The court therefore concluded "the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule," and thus the program retroactively applies to defendants whose cases are not yet final. (*Ibid*.) That is the case for defendant here.

The *Frahs* court further rejected the People's argument the defendant there was not entitled to remand because he did not make an adequate showing of eligibility. (*Frahs, supra*, 9 Cal.5th at pp. 637-638.) The People argued the defendant had to demonstrate he met all six threshold eligibility requirements before the appellate court

31

could remand. (*Ibid.*) The court found imposing such a high bar for remand "would be unduly onerous and impractical" and "inconsistent with any sensible retroactive application of the statute." (*Id.* at p. 638.) Instead, the court concluded "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when, as here, the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion -- the defendant suffers from a qualifying mental disorder." (*Id.* at p. 640.)

Defendant points to evidence in the record indicating that she suffers from mental health disorders that qualify for diversion under section 1001.36, including bipolar disorder and schizophrenia. (See § 1001.36, subd. (b)(1)(A).) In view of *Frahs*, we conclude defendant is entitled to a conditional remand to allow the trial court to conduct a mental health diversion eligibility hearing under section 1001.36.

## 7.0    *Dueñas*-based Challenge

Defendant challenges the trial court's imposition of restitution fines, a domestic violence fund fee, and assessments for court operations and facilities. (§§ 1202.4, 1202.45, 1465.8, 1463.27; Gov. Code, § 70373.) Citing *Dueñas*, *supra*, 30 Cal.App.5th 1157 (review on own motion declined & request for depublication denied Mar. 27, 2019, S254210), defendant argues that the imposition of these fines, fee, and assessments without express consideration of her ability to pay is a violation of her due process rights. She asserts that the matter must be remanded for the trial court to conduct an ability to pay hearing. Anticipating the People's forfeiture argument, defendant asserts that she did not forfeit the ability to pay challenge because *Dueñas* was decided after her sentencing and any objection would have been futile based on existing law. We reject defendant's contentions.

Although it is defendant's burden to establish an inability to pay (accord, *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*) review granted Nov. 13, 2019, S257844; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 (*Frandsen*)), defendant neither

32

objected to the imposition of restitution fines, the domestic violence fund fee, and assessments generally nor asserted her inability to pay them (to refute the presumption that defendants capable of working who are serving a lengthy prison term will be able to pay assessments from prison wages (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139)).[9] As a result, existing authority would hold that defendant has forfeited the issue on appeal (*Frandsen*, *supra*, 33 Cal.App.5th at pp. 1154-1155), although there is also authority to the contrary (*Johnson*, *supra*, 35 Cal.App.5th at pp. 137-138; *People v. Castellano* (2019) 33 Cal.App.5th 485, 489).

In any event, subsequent published authority has called the reasoning of *Dueñas* into question. As digested in *People v. Hicks* (2019) 40 Cal.App.5th 320 review granted Nov. 26, 2019, S258946 (*Hicks*),[10] *Dueñas* is premised on authority involving a right under due process of access to the courts, and a bar against incarceration for an involuntary failure to pay fees or fines. (*Hicks*, at p. 325.) However, a *postconviction* imposition of fees and fines does not interfere in any respect with the right of access to either the trial or appellate court. (*Id.* at p. 326.) The *postconviction* imposition of fees and fines also does not result in any *additional* incarceration, and therefore a liberty interest that due process would protect is not present. (*Ibid.*) Since the stated bases for the conclusion in *Dueñas* do not support it, the question is whether due process generally otherwise compels the same result. (*Hicks*, at p. 327.) The People have a fundamental

---

[9]    We note that the defendant in *Dueñas* had in fact sought a hearing on her ability to pay on constitutional grounds. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1162-1163.)

[10]    The analysis of *Dueñas* in *Hicks* is adopted in *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281 (*Kingston*), and is paralleled in *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1068-1069 (*Aviles*), *People v. Caceres* (2019) 39 Cal.App.5th 917, 927, and in the opinions of individual justices in *People v. Santos* (2019) 38 Cal.App.5th 923, 937-938 (dis. opn. of Elia, J.), and *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1038-1041 (conc. opn. of Benke, J.).

interest in punishing criminal conduct, as to which indigency is not a defense (otherwise, defendants *with* financial means would suffer discrimination). It would also be contrary to the rehabilitative purpose of probation if a court were precluded at the outset from imposing the payment of fees and fines as part of educating a defendant on obligations owed to society. (*Id.* at pp. 327-328.) "For the reasons set forth above, we conclude that due process does not [generally] speak to this issue and that *Dueñas* was wrong to conclude otherwise." (*Id.* at p. 329.) *Kingston* agreed with *Hicks*. (*Kingston*, *supra*, 41 Cal.App.5th at p. 279.)

*Aviles* also found *Dueñas* to be wrongly decided, finding the only proper limit on fees and fines is the constitutional prohibition against excessive fines under the Eighth Amendment to the federal Constitution. (*Aviles*, *supra*, 39 Cal.App.5th at pp. 1061, 1067, 1069-1072; accord, *Kopp*, *supra*, 38 Cal.App.5th at p. 96, rev.gr.)

Therefore, given the absence of any *valid* claim under due process, we conclude defendant is not entitled to a remand for the trial court to consider her ability to pay the challenged fines, fee, and assessments.[11]

---

[11]    We find no merit in defendant's suggestion that the trial court erred in imposing a $250 domestic violence fund fee because the record reflects that she had no ability to pay this fee, as evidenced by the trial court's express finding that she was unable to pay for the presentence investigation report. While defendant is correct that the trial court made such a finding, it does not follow that reversal is required. The statute authorizing the imposition of a domestic violence fund fee provides, in relevant part: "The court shall determine if the defendant has the ability to pay the fee imposed under this section. In making that determination, the court shall take into account the total amount of fines and restitution that the defendant is subject to, and may waive payment of this additional fee." (§ 1463.27, subd. (b).) Defendant has not shown that the trial court was presented with evidence at sentencing demonstrating she had no ability to pay this fee. Nor has she identified anything in the record indicating that the trial court breached its duty to consider her ability to pay the fee. Because the trial court was not obligated to make express findings concerning her ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we cannot say on this record that the trial court abused its discretion. (*People v. Nelson* (2011) 51 Cal.4th 198, 227.)

**DISPOSITION**

We conditionally reverse the judgment and remand to the trial court for an eligibility determination under section 1001.36. " 'If the trial court finds that [defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [defendant] successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [defendant] does not meet the criteria under section 1001.36, or if [defendant] does not successfully complete diversion, then h[er] convictions and sentence shall be reinstated.' " (*Frahs, supra*, 9 Cal.5th at p. 641.)

                                                /s/

                                                BUTZ, J.*

We concur:

/s/

BLEASE, Acting P. J.

/s/

HOCH, J.

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.